# EXHIBIT A

2025 WL 595107
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

IN RE: FRAGRANCE DIRECT
PURCHASER ANTITRUST LITIGATION
IN RE: FRAGRANCE INDIRECT
PURCHASER ANTITRUST LITIGATION
IN RE: FRAGRANCE END-USER
PLAINTIFF ANTITRUST LITIGATION

Case No. 2:23-02174, Case No.
2:23-03249, Case No. 2:23-16127
|
Filed 02/21/2025

OPINION GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
RULE 12(b)(6) MOTIONS TO DISMISS

WILLIAM J. MARTINI, U.S.D.J.

**\*1** Before the Court are motions to dismiss three consolidated putative class action complaints brought against the same defendants for violations of state and federal antitrust laws and state consumer protection and unjust enrichment laws.

On March 7, 2023, European investigators conducted unannounced inspections of facilities operated by the four largest businesses in the fragrance industry and subsequently announced antitrust investigations against each of them. The investigations targeted businesses familiarly known as Firmenich, Givaudan, International Fragrances & Flavors ("IFF"), and Symrise (collectively, the "Defendant Businesses").

After the investigations were announced, a flurry of plaintiffs filed complaints against the Defendant Businesses. The Court consolidated the lawsuits into three separate putative class actions: the Direct Purchaser Action brought by companies who buy products directly from the defendants ("DP Plaintiffs"), *In re: Fragrance Direct Purchaser Antitrust Litigation*, 2:23-cv-2174; the Indirect Purchaser Action brought by individuals and companies that purchased products produced by the defendants from other sellers ("IP Plaintiffs"), *In re: Fragrance Indirect Purchaser Antitrust*

*Litigation*, 2:23-cv-3249; and the End-User Action brought by individuals who purchase consumer goods containing the products produced by the defendants ("EUP Plaintiffs"), *In re: Fragrance End-User Plaintiff Antitrust Litigation*, 2:23-16127. [1]

Plaintiffs in all three actions filed consolidated complaints (the "Complaints"). Each Complaint alleges a different mix of causes of action, but together, they allege violations of Sections 1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 & 3 (seeking relief under the Clayton Act, 15 U.S.C. §§ 15 (treble damages), 25 (equitable relief)); the state antitrust and consumer protection laws of 33 states and the District of Columbia; and common law unjust enrichment. Multiple entities within the corporate families of Firmenich, Givaudan, and Symrise are named as defendants in each lawsuit.

The parties in all three consolidated suits stipulated to a briefing schedule pursuant to which the defendants filed one omnibus Rule 12(b)(6) motion to dismiss the Complaints for failure to state a claim, and three of the Defendant Businesses' foreign parent companies filed separate Rule 12(b)(2) motions to dismiss for lack of personal jurisdiction. These motions became fully briefed on July 15, 2024. This opinion addresses Plaintiffs' 12(b)(6) motion; the Court will issue an additional Opinion addressing the pending 12(b)(2) motions. For the reasons that follow, Plaintiffs' omnibus motion to dismiss pursuant to Rule 12(b)(6) is **GRANTED IN PART** and **DENIED IN PART**.

**I. FACTUAL BACKGROUND**
**\*2** Plaintiffs allege the following facts which are accepted as true for the purpose of defendants' 12(b)(6) motion.

On March 7, 2023, the European Commission announced that it had carried out "unannounced inspections at the premises of companies and an association active in the fragrance industry in various" European countries suspecting anticompetitive business practices in consultation with Swiss, U.K., and U.S. law enforcement. DC ¶ 163; IC ¶ 195; EC ¶ 218. The day after the inspections were announced, the Swiss Competition Commission opened an investigation into the fragrance sector. DC ¶ 166; IC ¶ 198; EC ¶ 221. The U.S. Department of Justice Antitrust Division issued subpoenas to at least two of the defendants. DC ¶¶ 171-72; IC ¶¶ 203-204; EC ¶¶ 226-227. The Government Investigations targeted IFF, Symrise, Givaudan, and Firmenich. According to the Complaints, the publicization of the Government

Investigations put them on notice of the defendants' anticompetitive conduct, which defendants had fraudulently concealed up to that point. DC ¶ 178-84; IC ¶¶ 227-234; EC ¶¶ 235-241.

### A. The Defendants

The Defendant Businesses are the world's four largest producers of fragrance ingredients and fragrance compounds ("Fragrance Products"), collectively controlling roughly 64% of the global market and a roughly equivalent proportion of the U.S. market. DC ¶¶ 70; IC ¶ 98; EC ¶ 124. Defendants acquire organic and synthetic raw materials, use those raw materials to produce Fragrance Products (typically in the form of oils or powders), and sell those products to companies who add them to consumer goods (including, *e.g.*, candles, soaps, perfumes, detergents, and household cleaning products).

Defendant IFF is a New York corporation with a principal place of business in New York, New York. DC ¶ 20; IC ¶ 43; EC ¶ 75. As of 2022, IFF controlled roughly 22% of the global fragrance market. DC ¶¶ 70; IC ¶ 98; EC ¶ 124.

Defendant Givaudan SA is a Swiss corporation with a principal place of business in Vernier, Switzerland. DC ¶ 21; IC ¶ 34; EC ¶ 76. Givaudan Fragrances Corporation is a U.S. subsidiary of Givaudan SA incorporated under the laws of Delaware and operating with a principal place of business in East Hanover, New Jersey. DC ¶ 22; IC ¶ 35; EC ¶ 77. Defendant lingerer & Company, Inc. is a Delaware corporation with a principal place of business in Lincoln Park, New Jersey, and has operated as a wholly-owned subsidiary of Givaudan SA since its acquisition in 2020. DC ¶ 23; IC ¶ 36; EC ¶ 78. Defendant Custom Essence LLC is a New Jersey corporation headquartered in Somerset, New Jersey which has operated as a wholly-owned subsidiary of Givaudan SA since 2021. DC ¶ 24; IC ¶ 37; EC ¶ 79. For the purpose of this Opinion, Defendants Givaudan SA, Givaudan Fragrances Corporation, Ungerer, and Custom Essence collectively constitute "Givaudan." As of 2022, Givaudan controlled roughly 18% of the global fragrance market. DC ¶¶ 70; IC ¶ 98; EC ¶ 124.

Defendant DSM-Firmenich AG is a Swiss corporation with a principal place of business in Kaiseraugst, Switzerland. DC ¶ 25; IC ¶ 28; EC ¶ 80. DSM-Firmenich AG was formed by the May 2023 merger of DSM Group and Defendant Firmenich International SA. DC ¶ 25; IC ¶ 28; EC ¶ 80. Defendant Firmenich International SA is a Swiss corporation headquartered in Satigny, Switzerland. DC ¶ 26; IC ¶ 29; EC

¶ 81. Defendant Firmenich Inc. is a U.S. subsidiary of DSM-Firmenich AG incorporated in Delaware with a principle place of business in Plainsboro, New Jersey, DC ¶ 27; IC ¶ 31; EC ¶ 82. Defendant Agilex Flavors & Fragrances, Inc. is a Delaware corporation with a principle place of business in Piscataway, New Jersey which has operated as a Firmenich subsidiary since its acquisition in July 2017. DC ¶ 28; IC ¶ 32; EC ¶ 83. Agilex's parent company was Defendant Firmenich International SA until that company's merger with DSM Group in 2023; post-merger, Agilex's parent company is Defendant DSM-Firmenich AG. DC ¶ 28; IC ¶ 32; EC ¶ 83. For the purpose of this Opinion, Defendants DSM-Firmenich AG, Firmenich International SA, and Agilex collectively constitute "Firmenich." As of 2022, Firmenich controlled roughly 11% of the global fragrance market. DC ¶¶ 70; IC ¶ 98; EC ¶ 124.

**\*3** Defendant Symrise AG is a German company with a principal pace of business in Holzminden, Germany. DC ¶ 29; IC ¶ 39; EC ¶ 84. Symrise AG has two U.S. subsidiaries: Symrise Inc., a New Jersey corporation with a principal place of business in Teterboro, New Jersey, and Symrise US LLC, a Delaware LLC headquartered in Teterboro, New Jersey. DC ¶¶ 30-31; IC ¶¶ 40-41; EC ¶¶ 85-86. For the purpose of this Opinion, Symrise AG, Symrise Inc., and Symrise US LLC collectively constitute "Symrise." As of 2022, the Symrise controlled roughly 12% of the global fragrance market. DC ¶¶ 70; IC ¶ 98; EC ¶ 124.

The defendants are the predominate players in the fragrance industry. Each of the Defendant Businesses has built up its market share through mergers and acquisitions since at least 2014. DC ¶ 71-75; IC ¶¶ 101-105; EC ¶¶ 125-129. The Defendant Businesses are also "vertically integrated to varying degrees," and IFF, Givaudan, and Firmenich have each made public statements acknowledging their vertical integration. DC ¶ 76; IC ¶ 106; EC ¶ 130. Plaintiffs allege through circumstantial evidence (including evidence of a pattern of coordinated price increases, anticompetitive market characteristics, common membership in trade associations that provided an opportunity to form an agreement, economic indicators, and the use of monitoring mechanisms, all buttressed by the initiation of the Government Investigations), that the defendants formed an agreement to fix prices and restrain trade in the fragrance market globally and within the United States.

### B. The Plaintiffs

The plaintiffs in the direct purchaser action are five U.S. companies located in Pennsylvania, New York, and Arkansas who allege that they purchased Fragrance Products directly from the Defendant Businesses during the class period. They bring one claim for conspiracy in restraint of trade under Sections 1 and 3 of the Sherman Antitrust Act (15 U.S.C. §§ 1 & 3) on behalf of themselves and a putative nationwide class of "persons and entities in the United States and its territories who purchased Fragrance Products directly from any of the Defendants or their subsidiaries or affiliates during the period at least as early as January 1, 2018 until the effects of the conspiracy ceased." DC ¶ 186.

The plaintiffs in the indirect purchaser action are fourteen individuals and companies located in ten different states who allege that they "purchased [Fragrance Products] other than directly from Defendants or alleged co-conspirators for incorporation into a Finished Fragrance Product" during the class period. IC ¶ 12. They bring claims for conspiracy in restraint of trade under Sections 1 and 3 of the Sherman Antitrust Act (15 U.S.C. §§ 1 & 3); violation of the antitrust statutes of 27 states and the District of Columbia; violation of the consumer protection statutes of 10 states; and common law unjust enrichment (under the laws of 30 states and the District of Columbia). IC ¶¶ 245-308. Their claims are brought on behalf of themselves and a putative nationwide class of "persons or entities who purchased [Fragrance Products] other than directly from Defendants or alleged co-conspirators for incorporation in a Finished Fragrance Product, where the person or entity purchased in the United States during the Class Period." IC ¶ 235.

The plaintiffs in the end-user action are 67 individuals from 31 states and the District of Columbia who purchased consumer goods containing Fragrance Products produced by Defendants or their co-conspirators. EC ¶ 242. They bring claims for conspiracy in restraint of trade under Sections 1 of the Sherman Antitrust Act (15 U.S.C. § 1); violation of the antitrust statutes of 29 states and the District of Columbia; violation of the consumer protection statutes of 18 states and the District of Columbia; and common law unjust enrichment. EC ¶¶ 257-324. Their claims are brought on behalf of themselves and a putative nationwide class of "persons or entities in the United States who purchased consumer products or household goods, not for resale, which contained Fragrance[ ] Products that were manufactured or sold by Defendants, any current or former subsidiary of Defendants, or any co-conspirator of Defendants." EC ¶ 242.

## C. Substantive Allegations [2]

### 1. Alleged Parallel Conduct

**\*4** According to the plaintiffs, beginning "at least as early as January 1, 2018," defendants entered into an unlawful agreement to increase prices in the fragrance industry. DC ¶ 105; IC ¶ 247; EC ¶ 159. Plaintiffs allege that following a period of steady decline in the cost of Fragrance Products, during a period in which prices had plateaued, the defendants initiated a series of parallel price increases that dramatically increased the price of Fragrance Products in the United States, DC ¶¶ 106-108; IC ¶¶ 136-138; EC ¶¶ 160-163.

Relying on publicly available information, Plaintiffs make the following allegations of parallel price increases:

- Beginning in January 2018, Givaudan announced a 6% price increase effective the following month. Givaudan's first-quarter sales report stated that the company "continue[d] to implement price increases in collaboration with its customers to compensate for the increase in input costs." DC ¶ 109-10, IC ¶ 139-40; EC ¶ 164-65.

- Symrise made a substantially similar statement during their first-quarter earnings call. DC ¶ 110, IC ¶ 140; EC ¶ 165.

- In an August 7, 2018 SEC filing, IFF disclosed a 9% net sales increase due in part to price increases. DC ¶ 111; IC ¶ 141; EC ¶ 166.

- Symrise announced another price increase on August 14, 2018. DC ¶ 112; IC ¶ 142; EC ¶ 167.

- IFF's then-CEO announced on September 6, 2018 that IFF's teams were increasing prices "as much as they can." DC ¶ 113; IC ¶ 143; EC ¶ 168.

- On October 8, 2018, Givaudan confirmed that it too was continuing to increase prices "to compensate for increase in input costs." DC ¶ 114; IC ¶ 144; EC ¶ 169.

- On a January 25, 2018 investor call, Givaudan announced that the company was "working on price increases." DC ¶ 115; IC ¶ 145; EC ¶ 170.

- On February 19, 2019, IFF's Vice President of Global Communications and Investor Relations announced that IFF was looking to achieve "about a 4% increase related to the scent" business. DC ¶ 116; IC ¶ 146; EC ¶ 171.

- On July 18, 2019, Givaudan's CEO indicated that Givaudan was able to recoup all the increases in costs of its raw materials through price increases. DC ¶ 118; IC ¶ 148; EC ¶ 173.

- On August 10, 2019, Symrise's Chief Financial Officer reported that Symrise was "successful in getting through" price increases in the fragrance segment. DC ¶ 118; IC ¶ 148; EC ¶ 173.

- During a September 2019 conference, IFF's CEO announced multiple quarters of "mid-single-digit growth" in the fragrance business attributable half to sales volume and half to price growth. DC ¶ 118; IC ¶ 148; EC ¶ 173.

- One of Symrise's executives commented on strong profitability metrics in the fourth quarter of 2019 "mainly due to under-proportional raw material price increases and good cost management" while another allegedly remarked regarding raw material costs "most of this levels out ... a lot of these effects level themselves out," DC ¶ 119; IC ¶ 149; EC ¶ 174.

- In July 2020, Givaudan's CEO announced that its improved profit margin was not related to a change in raw material costs, but instead was attributable to price increases which allowed the company's fragrance division to grow 4.5% like-for-like despite the Covid-19 pandemic occurring in the intervening months." DC ¶ 120; IC ¶ 150; EC ¶ 175.

- On August 11, 2020, Firmenich's CEO reported a 6% revenue increase attributable to the company's "successful pricing" and the "favourable impact of raw material costs." DC ¶ 121; IC ¶ 151; EC ¶ 176.

- In November 2021, IFF executives acknowledged "increasing prices to combat inflationary pressures" and "broad-based pricing actions across all of our businesses," DC ¶ 123; IC ¶ 153; EC ¶ 178.

- **\*5** • Firmenich's CEO announced that in the second half of 2021 Firmenich's "revenue grew by 12%" and adjusted EBITDA increased "by 25%," which plaintiffs attribute to price increases. DC ¶ 124; IC ¶ 154; EC ¶ 179.

- Symrise's CEO confirmed in 2022 that it had increased prices during the second half of 2021. DC ¶ 125; IC ¶ 155; EC ¶ 180.

- In March of 2022, IFF announced more price increases, DC ¶ 126; IC ¶ 156; EC ¶ 181, and Givaudan followed suit with a similar announcement a month later, DC ¶ 127; IC ¶ 157; EC ¶ 182.

- On a May 2022 earnings call, IFF acknowledged a roughly 8% price increase during the first quarter of 2022, and noted that they were "not unique" and that "all of our competitors are out there basically taking prices up as well." DC ¶ 128; IC ¶ 158; EC ¶ 183. IFF's then-CEO confirmed that "IFF's price increases were 'neck to neck' with IFF's competitors 'in the market' " and, on the same call, he "also stated 'we actually expect – and what we've seen from an awful lot of our competitors is everybody is basically implementing *the same range of pricing* in the market." DC ¶ 139; IC ¶ 169; EC ¶ 194 (emphasis in original).

- On July 21, 2022, Givaudan announced another price increase, despite rising like-for-like sales in the preceding quarter. DC ¶ 129; IC ¶ 159; EC ¶ 184.

- On August 2, 2022, Symrise announced company-wide price increases. DC ¶ 130; IC ¶ 160; EC ¶ 185. Firmenich followed suit on August 5, 2022, announcing that they would continue increasing prices and acknowledging that 30% of the company's FY2022 growth was attributable to pricing. DC ¶ 131; IC ¶ 161; EC ¶ 186. In November 8, 2022, IFF's CFO also acknowledged continued price increases. DC ¶ 132; IC ¶ 162; EC ¶ 187.

- In January 2023, Givaudan's CFO told investors that price increases had partially compensated for higher fragrance input costs in the preceding months. DC ¶ 133; IC ¶ 163; EC ¶ 188.

- On February 9, 2023, IFF CFO Glenn Richter indicated that there had been price increases in the company's scent division, DC ¶ 134; IC ¶ 164; EC ¶ 189, and one week later, Firmenich announced that its continued growth was attributable in part to "strong pricing measures" and that "further pricing actions" would be taken going forward. DC ¶ 135; IC ¶ 165; EC ¶ 190.

- In March 2023, Symrise's CFO reported that its 11.4% sales growth in 2022 was attributable "around 75% [to] pricing and around 25% volume growth in organic." DC ¶ 136; IC ¶ 166; EC ¶ 191.

Plaintiffs also rely on Bureau of Labor Statistics data reflecting a marked increase in fragrance prices market-wide during the class period, though most of that increase came after the announcement of the Government Investigations. DC ¶ 106; IC ¶ 136; EC ¶ 161.

### 2. Alleged "Plus-Factors"
The complaints allege several market characteristics present in the fragrance industry as circumstantial evidence of anticompetitive conduct:

Pretextual Explanations for Parallel Conduct: According to plaintiffs, defendants' pattern of price increases from 2018 through 2022 "are not adequately explained by market factors" like increased input costs during the pandemic. DC ¶ 107; IC ¶ 137; EC ¶ 162. They point to the fact that sales and profit measures increased during the class period and that defendants were able to pass on a significant amount of increased materials costs to consumers without suffering a competitive disadvantage as a result. DC ¶¶ 141 -54; IC ¶¶ 171-184; EC ¶¶ 196-209. Accordingly, they allege on information and belief that defendants' purported reasons for price increases during the class period were pretextual. DC ¶ 140; IC ¶ 170; EC ¶ 195.

**\*6** High Barriers to Entry: Plaintiffs allege that the Defendant Businesses' control over the fragrance industry is protected by high barriers to entry for would-be competitors: new entrants would, for example, need to learn to navigate a robust regulatory landscape and gain access to raw materials (some of which are already largely controlled by the defendants), which would be made more difficult by the high volume of capital required for adequate research, development, and marketing in an already-concentrated industry, particularly before obtaining economies of scale. DC ¶¶ 77-78; IC ¶¶ 107-108; EC ¶¶ 131-132. Defendants Businesses IFF, Givaudan, and Symrise have acknowledged high entry barriers in public statements. DC ¶¶ 79-80; IC ¶¶ 109-110; EC ¶¶ 133-134.

Fragrance Products as Interchangeable Commodities: According to plaintiffs, the fragrance ingredients created by defendants are "interchangeable commodity chemicals" such that there is "no meaningful difference between a fragrance ingredient (or combination of fragrance ingredients in the form of a fragrance compound) produced by one Defendant as compared to another." DC ¶ 58; IC ¶ 86; EC ¶ 112; *see also* DC ¶ 59-65; IC ¶¶ 87-93; EC ¶¶ 113-119 (citing public statements by the defendants indicating their awareness of

"substitutability" of the fragrance compounds they produce). Defendants primarily produce their own Fragrance Products for sale to downstream customers, but according to plaintiffs, the defendants also buy and sell Fragrance Products from each other. DC ¶¶ 66-67; IC ¶¶ 94-95; EC ¶¶ 120-121. According to the plaintiffs, "[t]he substitutability of Defendants' Fragrance Products should have led to price competition among Defendants and substantially restrained their abilities to increase prices unilaterally." DC ¶ 65; IC ¶ 93; EC ¶ 119.

Opportunity to Collude: Plaintiffs point to the Defendant Businesses' participation in industry/trade associations as evidence that they had the means and opportunity to engage in collusive behavior. First, the plaintiffs point to the International Fragrance Association ("IFRA"), a self-regulatory body made up of seven members, of which the defendants comprise four. DC ¶ 91; IC ¶ 121; EC ¶ 144. Each of the Defendant Businesses is represented on IFRA's board, which is chaired by a Symrise executive, and representatives from each Defendant Business attend events hosted by the organization. DC ¶¶ 92-93; IC ¶¶ 122-23; EC ¶¶ 145-46. Each Defendant Business was also represented in the North America-focused Fragrance Creators Association ("FCA"), before jointly deciding to leave to form their own Association (the Fragrance Science & Advisory Council, or "FSAC") in March 2021. DC ¶¶ 94-96; IC ¶¶ 124-26; EC ¶¶ 147-49. The Defendant Businesses were the only members of FSAC at its founding; as of today they have added one additional member, and Defendant IFF left the organization after the Government Investigations began to rejoin FCA. The Defendant Businesses are also represented in the Research Institute for Fragrance Materials ("RIFM") which, alongside IFRA, controls safety standard-setting and enforcement in the industry. DC ¶¶ 97-99; IC ¶¶ 127-29; EC ¶¶ 150-52. Plaintiffs identify defendants' membership in these organizations, along with their mutual participation at other industry events, DC ¶¶ 102-03; IC ¶¶ 132-33; EC ¶¶ 155-56, as the fora in which defendants developed their price-fixing conspiracy. DC ¶ 104; IC ¶ 134; EC ¶ 157.

Monitoring Mechanisms: Plaintiffs allege that the defendants monitored their price-fixing arrangement through public statements (including those mentioned above) and by exchanging competitively sensitive information by engaging in inter-defendant sales, DC ¶¶ 138-39; IC ¶¶ 168-69; EC ¶¶ 193-94. They point to the observation of a former Deputy Assistant General in the U.S. Department of Justice Antitrust Division that cartels commonly rely

on "sophisticated mechanisms to monitor and police the[ir] agreements." DC ¶ 138; IC ¶ 168; EC ¶ 193. [3]

**\*7** <u>Scholarship on Global Fragrance Market Suggests Cartel Behavior:</u> Plaintiffs point out that several scholars have described the global fragrance market in anticompetitive terms, acknowledging (for example) an informal "gentleman's agreement" not to reverse engineer each others' products to create and market substantially identical products (thus driving the prices for Fragrance Products above competitive levels), which plaintiffs allege defendants themselves have publicly supported. DC ¶¶ 155-62; IC ¶¶ 185-94; EC ¶¶ 210-17.

<u>Additional Market Characteristics:</u> Plaintiffs identify a number of other characteristics of the fragrance market which allegedly make the fragrance market ripe for anticompetitive behavior, including: (1) a lack of concentration in the buy-side of the market, which minimizes the rewards for cheating on a cartel agreement without mitigating the risks (DC ¶¶ 82-83; IC ¶¶ 112-23; EC ¶¶ 136-37); (2) inelastic demand (as evidenced by a lack of substitute goods [4] and the fact that they make up a relatively small share of the overall cost of the end-user products into which they are incorporated) (DC ¶¶ 84-86; IC ¶¶ 114-15; EC ¶¶ 138-39); (3) the fact that Fragrance Products are commodities (DC ¶ 87; IC ¶ 116; EC ¶ 140); and (4) the fact that Fragrance Products are nondurable with a relatively short shelf life (DC ¶ 88; IC ¶ 117; EC ¶ 141).

## II. DISCUSSION

### A. 12(b)(6) Failure to State a Claim

Defendants' Rule 12(b)(6) motion argues that (1) the complaints should be dismissed in their entireties for failure to allege facts to plausibly suggest an agreement among the defendants; (2) certain portions of plaintiff's claims should be dismissed as time-barred both under the Sherman Act and under the relevant state statutes; (3) that the Indirect Purchaser Action and the End-User Action should be dismissed because the plaintiffs in those cases lack antitrust standing; and (4) that the state law claims should be dismissed for a variety of state-specific reasons. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Huertas v. Bayer US LLC*, 120 F.4th 1169, 1174 (3d Cir. 2024) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2007) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "While the plausibility standard does not impose

a 'probability requirement,' it does demand 'more than a sheer possibility that a defendant has acted unlawfully.'" *Id.* (quoting *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012) and *Iqbal*, 556 U.S. at 678).

#### 1. Alleging Agreement

To state a claim under Section 1 of the Sherman Act, "[f]irst, the plaintiff must show that the defendant was a party to a contract, combination ... or conspiracy." *In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010) (citing *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 218 (3d Cir. 2008)). The plaintiffs must demonstrate that the defendants were engaged in "some form of concerted action," *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 117 (3d Cir. 1999), demonstrating a " 'unity of purpose or a common design and understanding or a meeting of minds' or 'a conscious commitment to a common scheme," *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). Defendants argue that Plaintiffs failed to clear this crucial pleading hurdle and that, as a result, their federal antitrust claims must fail.

**\*8** "A plaintiff may plead an agreement by alleging direct or circumstantial evidence, or a combination of the two. If a complaint includes non-conclusory allegations of direct evidence of an agreement, a court need go no further on the question whether an agreement has been adequately pled." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010). "However, where a plaintiff fails to plead direct evidence of an agreement and relies instead upon indirect or circumstantial evidence, such evidence must 'plausibly show the existence of an agreement.'" *TruePosition, Inc. v. LM Ericsson Tel. Co.*, 844 F. Supp. 2d 571, 594 (E.D. Pa. 2012) (quoting *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 226 (3d Cir. 2011)). Here, the plaintiffs do not allege any "smoking gun"—they instead rely on circumstantial evidence to support a plausible inference of an agreement between the defendants.

##### i. Parallel Conduct

Plaintiffs who lack direct evidence of a conspiracy can state a Sherman Act claim by alleging evidence of parallel conduct alongside other facts or circumstances that nudge the allegations across the threshold from the merely "conceivable" to the "plausible." *See Twombly*, 550 U.S. 544, 557 (2007) ("An allegation of parallel conduct ... gets

the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief." (cleaned up)). "[A] showing of parallel pricing requires only evidence that defendants 'acted similarly,' not evidence that they charged the same prices or engaged in identical conduct." *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 442 (E.D. Pa. 2018) (quoting *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1243 (3d Cir. 1993)) Indeed, "Plaintiffs are not required to plead simultaneous price increases—or that the price increases were identical—in order to demonstrate parallel conduct." *Id.* at 441 (quoting *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 630 (E.D. Pa. 2010)); *see also In re Text Messaging Antitrust Litig.*, 2009 WL 5066652 (N.D. Ill. Dec. 10, 2009) ("The defendants' parallel actions are spread out over several months; defendants refer to them as 'sequential' rather than 'simultaneous.' ... For purposes of this motion, however, the Court will accept that these acts sufficiently identify 'parallel conduct.' "). "Nor are [Plaintiffs] required to plead with specificity the price by which each [product] was increased at a particular time." *In re Blood Reagents*, 756 F. Supp.2d at 630.

Plaintiffs allege a series of public statements by Defendants in which the Defendants announced price increases timed closely to one another. These statements did not occur simultaneously—nor, necessarily, did the price increases that they describe—but collectively they appear to demonstrate a pattern of Defendants' similar pricing activities. At least one of Defendant IFF's statements itself evidences Defendants' knowledge of the consistency in their pricing conduct vis-à-vis their competitors. *See* DC ¶ 139; IC ¶ 169; EC ¶ 194 ("[W]e actually expect – and what we've seen from an awful lot of our competitors is everybody is basically implementing the same range of pricing in the market."). These allegations of repeated, similarly timed price increases over the course of more than four years by the defendants support a finding of parallel conduct.

### ii. Flits Factors

The Court turns then to whether Plaintiffs' "plus factor" allegations suffice. "[P]lus factors are simply circumstances in which the inference of independent action is less likely than that of concerted action." *Avenarius v. Eaton Corp.*, 898 F. Supp. 2d 729, 738 (D. Del. 2012). "The Third Circuit has identified at least three 'plus factors' that may support a finding that there is a suggestion of a preceding agreement: (1) evidence that the defendant had a motive to enter into

a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy." *In re Generic Pharmaceuticals Pricing*, 338 F.Supp.3d at 447-48.

**\*9** Plaintiffs pleaded facts supporting a motive to undertake a price fixing conspiracy by alleging, for example, that a lack of concentration in the buy-side of the fragrance market minimizes the reward for cheating on a cartel agreement without mitigating the risks, making cartel compliance more attractive to participants (DC ¶¶ 82-83; IC ¶¶ 112-23; EC ¶¶ 136-37); that market for Fragrance Products is characterized by inelastic demand and a lack of ready substitution (DC ¶¶ 84-86; IC ¶¶ 114-15; EC ¶¶ 138-39), *see In re Generic Pharmaceuticals Pricing*, 338 F.Supp.3d at 448 (inelastic demand weighing in favor of motive plus-factor); and that prior to the alleged conspiracy, prices for Fragrance Products had been falling (DC ¶ 106; IC ¶ 136; EC ¶ 160), *see id.* ("Declining prices or profits in a market make 'price competition more than usually risky and collusion more than usually attractive.' " (quoting *In re Blood Reagents Antitrust Litig. (II)*, 266 F.Supp.3d 750, 772 (E.D. Pa. 2017)).

As to actions against self interest, Plaintiffs alleged that Defendants consistently increased prices even during a period where their supply costs had stabilized. DC ¶¶ 141-54; IC ¶¶ 171-184; EC ¶¶ 196-209. Plaintiffs allege that "[s]uch price increases—with respect to magnitude and frequency—should not have been possible in a truly competitive market because customers ... would have taken their business elsewhere in response to rising prices." DC ¶ 137; IC ¶ 167; EC ¶ 192. *See also* DC ¶¶ 108, 141; IC ¶¶ 138, 171; EC ¶¶ 163, 196.

Finally, as to evidence implying a traditional conspiracy, Plaintiffs allege that Defendants leveraged their positions in the industry's leading trade associations—one of which consisted, for a time, of only the Defendants—to create opportunities to collude. DC ¶¶ 102-04; IC ¶¶ 132-34; EC ¶¶ 155-57. Defendants' exclusive membership in the FSAC is particularly noteworthy; Plaintiffs allege that in May 2020 (*i.e.*, during the alleged conspiracy), the Defendants all announced their decisions to depart the "North America-focused Fragrance Creators Association ('FCA')" and in March 2021, launched the FSAC with only the Defendant businesses as members. DC ¶¶ 94-95; IC ¶¶ 124-25; EC ¶¶ 149-50. They point to public statements and intradefendant sales as the monitoring mechanisms by which each enforced the alleged conspiracy. DC ¶¶ 138-39; IC ¶¶ 168-69; EC ¶¶ 193-94. And they rely on scholarship analyzing the fragrance

industry and describing a "gentleman's agreement" not to create identical products. DC ¶¶ 155-62; IC ¶¶ 185-94; EC ¶¶ 210-17. On top of that, the existence of the Government Investigations, while not independently sufficient to support Plaintiffs' allegations, is one among these several plus factors weighing against dismissal at the pleading stage. *See In re Generic Pharmaceuticals Pricing*, 338 F. Supp. 3d at 452.

Defendants raise substantial and meaningful questions as to (a) whether Plaintiffs' allegations of parallel pricing themselves demonstrate anything other than innocent companies responding to external market and commercial forces, (b) whether Plaintiffs' allegations of price increases as reflected by Defendants' public statements came to fruition as alleged, and (c) the evidentiary basis for, and significance of, Plaintiffs' alleged plus factors. But these all are essentially factual matters best left for resolution on a fuller record.

### 2. Time-Barred Claims

Sherman Act claims are subject to a four-year statute of limitations. 15 U.S.C. § 15b; *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144 (3d Cir. 1993). "In the context of a continuing conspiracy to violate the antitrust laws ... each time a plaintiff is injured by an act of the defendants a cause of action accrues [ ] to recover the damages caused by that act and ... as to those damages, the statute of limitations runs from the commission of the act." *W. Perm Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 106 (3d Cir. 2010).

**\*10**  Defendants argue that Plaintiffs' federal claims are time-barred to the extent that they seek damages accruing more than four years before the filing of the first of the now-consolidated complaints. [5] In other words, they do not move to dismiss the entirety of Plaintiffs' antitrust claims, but seek to limit Plaintiffs' possible recovery to harms incurred by actions taken within the four-year period prior to the filing of Plaintiffs' first complaint. They make the same argument with respect to the state law claims at issue, noting that many of the state claims are subject to three- or four-year statutes of limitations. *See* Mot. App'x B, ECF No. 140-3.

Plaintiffs respond, first, that dismissal on statute of limitations grounds is premature at this stage of the litigation, and second, that if the Court does consider Defendants' statute of limitations argument, it should deny Defendants' motion because Plaintiffs have adequately pled fraudulent concealment such that the statute of limitations should be equitably tolled.

#### i. Rule 12(b)(6) Statute of Limitations Standard

While the Federal Rules of Civil Procedure ordinarily require a statute of limitations defense to be raised in a responsive pleading, courts in the Third Circuit permit defendants to raise the defense in a Rule 12 motion in certain circumstances. *See Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002); *Calabria Ristorante, Inc. v. Ruggiero Seafood, Inc.*, 706 F. Supp. 3d 489, 511 (D.N.J. 2023). Specifically, a court in this Circuit may grant a Rule 12(b)(6) motion to dismiss on statute of limitations grounds only if it is apparent from the face of the complaint that the cause of action alleged has not been brought within the statute of limitations. *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978) ("If the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)."); *Cito v. Bridgewater Tw'p Police Dept.*, 892 F.2d 23, 25 (3d Cir. 1989) (applying same standard); *Leisten v. CBS Broadcasting Inc.*, 2023 WL 6890733 at \*2 (3d Cir. 2023) (same); *Ruggiero Seafood, Inc.*, 706 F. Supp. 3d at 511 (same).

It is apparent from the face of Plaintiffs' complaints that some of the conduct on which they base their damages claims occurred prior to the limitations period. *See, e.g.*, DC ¶¶ 110-16; IC ¶¶140-46; EC ¶¶ 165-71. Plaintiffs do not dispute this fact—instead, they argue that the statute of limitations should be tolled because Defendants fraudulently concealed their conduct, but appear to argue that the sufficiency with which they plead fraudulent concealment cannot be determined without a more developed factual record. *See* Opp. at 35-36 ("Issues relating to fraudulent concealment, including 'the date on which a plaintiff discovered, or reasonably should have discovered, the purported wrongdoing is an inherently factual inquiry that is usually not ripe for resolution on a motion to dismiss.' " (citing *In re Fasteners Antitrust Litig.*, 2011 WL 3563989, at \*3 (E.D. Pa. Aug. 12, 2011) ("Fasteners")). Though Plaintiffs cite *Fasteners* for the proposition that the Court should decline to consider the statute of limitations issue as premature, the district court in that case *did* consider the defendants' statute of limitations defense and the plaintiffs' invocation of the fraudulent concealment exception. *See Fasteners* at \*3. The Court takes the same approach here. *Accord In re Processed Eggs Antitrust Litig.*, No. 08-MD-02002, 2011 WL 5980001, at \*2 (E.D. Pa. Nov. 30, 2011) ("Eggs I") ("If a plaintiff pleads facts that demonstrate fraudulent concealment in satisfaction of the requisite pleading standards, the plaintiff may pursue antitrust claims for recovery of damages during the tolled period.").

### ii. Fraudulent Concealment

**\*11**  "The fraudulent concealment doctrine operates to stop the statute of limitations from running in circumstances when the accrual date of a claim has passed and the 'plaintiffs cause of action has been obscured by the defendant's conduct.' " *Eggs I* at \*2 (quoting *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 160 (3d Cir. 2002)). While it is true that fraudulent concealment "must be pleaded with particularity under Federal Rule of Civil Procedure 9(b)," *Fasteners* at \*3 (citing *In re Elect. Carbon Prods. Antitrust Litig.*, 333 F. Supp. 2d 303, 315 (D.N.J. 2004)), "courts have relaxed the rule when factual information is peculiarly within the defendant's knowledge or control," *id.* (citing *Craftmatic Sec. Litig. V. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989)). "To invoke equitable tolling through fraudulent concealment at the pleading stage—to state a claim of fraudulent concealment, as it were—a plaintiff must allege particularized facts sufficient to suggest '(1) that the defendant actively misled the plaintiff; (2) which prevented the plaintiff from recognizing the validity of her claim within the limitations period; and (3) where the plaintiff's ignorance is not attributable to her lack of reasonable due diligence in attempting to uncover the relevant facts.' " *Eggs I* at \*3 (quoting *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 509 (3d Cir. 2006)); *accord Fasteners* at \*3.

### a. Active misleading

Courts in the Third Circuit have embraced at least three different standards for determining whether a plaintiff has adequately pled fraudulent concealment of an antitrust conspiracy claim.

In some cases, courts have determined that antitrust conspiracies are "self-concealing"—*i.e.*, that simply by stating a claim for antitrust conspiracy, a plaintiff satisfies its burden to demonstrate that the defendant has actively misled them. *See, e.g., Bethlehem Steel Corp. v. Fischbach & Moore, Inc.*, 641 F. Supp. 271, 274 (E.D. Pa. 1986) ("[A] self-concealing conspiracy is the logical equivalent of affirmative acts which conceal a plaintiff's claim ... [there is] no reason to distinguish between situations where a conspiracy is self-concealing and where plaintiff alleges affirmative conduct by the defendant to conceal wrongdoing.").

In others, courts have applied an intermediate pleading standard, requiring that the plaintiff plead an affirmative act of concealment, but permitting that requirement to be satisfied by the same allegations that give rise to the underlying conspiracy claim. *See, e.g., In re Mercedes-Benz Antitrust Litig.*, 157 F. Supp. 2d 355 (D.N.J. 2001) (adopting intermediate approach but recognizing applicability of self-concealing doctrine in some cases where the "concealment is so intertwined with the conspiracy as a whole that the equitable foundations of the fraudulent concealment doctrine require the limitations period to be tolled.").

And some earlier cases have required an affirmative act of concealment *independent* of the conduct giving rise to the antitrust conspiracy claims. *See, e.g., Pennsylvania v. Lake Asphalt & Petro. Co. of Pa.*, 610 F. Supp. 885, 888 (M.D. Pa. 1985).

The *Fasteners* court surveyed relevant antitrust opinions in the Circuit and concluded that "while there is some divergence, for the most part courts in this Circuit have applied the 'self-concealing' standard to antitrust conspiracies." *Fasteners* at \*4. After *Fasteners*, the court in *In re Magnesium Oxide Antitrust Litigation*, 2011 WL 5008090 (D.N.J. 2011) ("Magnesium") added a new theory to the mix by borrowing a standard from the District of Connecticut in holding that "whether a price-fixing conspiracy or, more precisely, whether a particular announcement of a price increase necessarily conceals its true nature depends on the nature of the industry and the circumstances surrounding the announcement." *Id.* at \*22 (citing *In re Publication Paper*, 2005 WL 2175139 (D. Conn. Sept. 7, 2005). That test would permit the court to treat *some* antitrust conspiracies as self-concealing, but only if plaintiffs plead "circumstances indicating that a price increase 'carries with it a pretense of legitimacy' or 'that it would necessarily be assumed that [it was] the result of legitimate market forces.' " *Id.*; *see also St. Rose v. Heavy Materials, LLC*, 2020 WL 13119079 (D.V.I. Sept. 22, 2020) (citing *Magnesium* for the proposition that "whether a particular price-fixing conspiracy is self-concealing may depend on the industry involved").

**\*12**  *Fasteners* appears to be correct that courts in this Circuit have come around to the conclusion that the self-concealing standard to antitrust conspiracies, including price-fixing conspiracies specifically. *Fasteners* at \*5 ("Price-fixing conspiracies are inherently self-concealing"); *see also In re Pressure Sensitive Labeldstock Antitrust Litigation*, 2006 WL 433891 (M.D. Pa. Jan. 3, 2006) (allegations of price-fixing conspiracy constituted sufficient allegations of self-concealing conspiracy); *In re Aspartame Antitrust Litigation*, 2007 WL 5215231 (E.D. Pa. Jan. 18, 2007) ("[T]he majority

of courts examining price-fixing conspiracies have deemed such conspiracies self-concealing.").

Under either *Fasteners*'s theory that price-fixing conspiracies are always self-concealing, or *Magnesium*'s theory that price-fixing conspiracies are self-concealing if they are coupled with allegations of circumstances indicating a pretense of legitimacy, Plaintiffs have satisfied their burden. With respect to the *Magnesium* standard, Plaintiffs allege that Defendants' public comments concerning many of their price increases —including some taking place in 2018, 2019, and 2021— indicated that the price hikes were attributable to an ordinary market force (i.e., increasing raw materials costs and/or inflationary pressures). DC ¶ 110, 114, 118, 123; IC ¶ 140, 144, 148, 153; EC ¶ 165, 169, 173, 178. Even if a price-fixing conspiracy were not always self-concealing, it would be here, where the price increases underlying the alleged conspiracy "carrie[d] with [them] a pretense of legitimacy." *Magnesium* at *22 (quoting *In re Publication Paper*, 2005 WL 2175139 (D. Conn. Sept. 7, 2005)); *accord In re Mercedes-Benz*, 157 F. Supp. 2d at 372 (at motion to dismiss stage, " '[p]roof of fraudulent concealment is found with *any* evidence of efforts designed to keep price fixing activities secret.' " (quoting *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019 (N.D. Miss. 1993)).

### b. Notice

The next issue is whether Plaintiffs were on notice of their claim before the announcement of the Government Investigations. *See* Mot. at 44-45. Defendants argue that Plaintiffs cannot square their claim that they " 'could not and did not discover the existence of their claims' " until the Government Investigations surfaced with their counsel's prior statement that they had been " 'monitoring Defendants' conduct in the fragrance market before the government authorities announced their investigations' resulting in 'factual allegations' that '**go well beyond**' the investigation announcements." *Id.* at 45 (quoting D. Dkt. ECF No. 32 at 10).

The logic of the "parallel conduct and plus factors" model of alleging an antitrust conspiracy requires there to be a tipping point before which Plaintiffs would not have had enough evidence of conspiracy to state a claim (and therefore could not be on notice of any such claim), and after which they would. In some cases, that tipping point may be the discovery of a government investigation. *See In re Blood Reagants Antitrust Litig.*, 756 F. Supp. 2d at 632 ("All of this the existence of a parallel criminal investigation— an allegation demonstrating that the government believes a crime may have occurred—and the result is 'enough fact

to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement."); *see also Hinds County, Miss. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 106 (S.D.N.Y. 2011) ("Although pending government investigations may not, standing alone, satisfy an antitrust plaintiff's pleading burden, government investigations may be used to bolster the plausibility of § 1 claims."); *In re Tableware Antitrust Litig.*, 363 F. Supp. 2d 1203, 1205 (N.D. Cal. 2005) ("A plaintiff may surely rely on governmental investigations, but must also ... undertake his own reasonable inquiry and frame his complaint with allegations of his own design.").

**\*13** Whether the publicization of the government investigations was the tipping point before which Plaintiffs had no notice of their claims is a factual matter requiring the determination of who knew what and when, and as such, cannot be determined before discovery. Plaintiffs' allegations that the Government Investigations put them on notice are sufficient to support a claim of fraudulent concealment.

### c. Diligence

Similarly, Plaintiffs' allegations are sufficient to satisfy their burden to plead due diligence at this stage. "[I]f a complaint plausibly suggests that a plaintiff lacked inquiry notice of her claim, then that plaintiff may not need to allege specific, detailed, or even generalized so-called due diligence in order to invoke the fraudulent concealment doctrine." *In re Processed Egg Products Antitrust Litig.*, 2013 WL 4504768 (E.D. Pa. Aug. 23, 2013) ("*Eggs II*"). "[T]o determine what constitutes 'reasonable' due diligence, we must consider the magnitude of the existing storm warnings. The more ominous the warnings, the more extensive the expected inquiry." *Id.* (quoting *Mathews v. Kidder, Peabody & Co., Inc.*, 260 F.3d 239 (3d Cir. 2001)). With that scope of inquiry in mind, it is no surprise that "[i]ssues of diligence and constructive notice, which are inherently factual, generally should not be decided on a motion to dismiss." *In re Aspartame*, 2007 WL 5215231, at *6 (citing, *inter alia*, *Bethlehem Steel*, 641 F. Supp. at 275 and *In re Mercedes-Benz*, 157 F. Supp. 2d at 374).

The closest the complaints come to alleging facts that might give rise to a more active diligence obligation is the allegation that, in some of their public statements, Defendants acknowledged that their increasing prices were consistent with competitors. *See, e.g.*, DC ¶ 128; IC ¶ 158; EC ¶ 183 ("all of our competitors are out there basically taking up prices as well"). The court's analysis in *Eggs II* may have required that, with these allegations, "plaintiffs 'should have undertaken *some* sort of inquiry—even if only a nominal one

—regarding the Defendants' concerted activity." *See Eggs II* at \*5 (citation omitted). This Court finds that, for the purposes of the motion to dismiss, reasonable diligence did not require Plaintiffs to undertake any inquiry because even these statements, as alleged, are not a sufficient warning sign to put reasonably diligent individuals on notice of a potential antitrust conspiracy.

Without more, a corporate executive defending price increases to investors by reference to comparable pricing from competitors is unlikely to cause suspicion that something nefarious is afoot; once considered in conjunction with additional evidence of wrongdoing (including, for example, the existence of governmental antitrust investigations), previously innocuous comments may take on a new significance. These issues, again, are best left for resolution after discovery.

In short, "[p]rocedurally, this lawsuit is still in its infancy.... The Court will not now dismiss potentially time-barred claims in the complaint on the pleadings alone, confident that each of the issues discussed above will be revisited with a mature record later in the case," *In re Mercedes-Benz*, 157 F. Supp. 2d at 374.

### 3. Antitrust Standing of IP and EUP Plaintiffs

Defendants next contend that the IP and EUP plaintiffs lack antitrust standing to bring their claims. Antitrust standing is "something of a misnomer" in that it requires more than ordinary Article III standing: "For a party to have 'antitrust standing,' it must do more than satisfy the familiar three-part test for standing—injury in fact, causation, and redressability —that arises from the constitutional requirement of a case or controversy," *In re Processed Egg Products Antitrust Litigation*, 881 F.3d 262, 268 (3d Cir, 2018) ("Eggs III") (internal citations and footnote omitted). "Instead, noting the breadth of § 4 [of the Clayton Act], courts have concluded that, rather than allowing antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation, the treble damages remedy should be confined to those individuals whose protection is the fundamental purpose of the antitrust laws." *Id.* at 268-69 (cleaned up).

**\*14** It is blackletter law that indirect purchaser plaintiffs are barred from pursuing damages actions under the federal antitrust laws. *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). IP Plaintiffs and EUP Plaintiffs do not seek damages for federal antitrust law violations here, But legislatures in a number of states have established the right of indirect purchasers to pursue state antitrust damages actions, and courts in still other states have interpreted their existing state laws to do the same. Of the states that permit damages actions under state law, many, but not all, employ the same antitrust standing analysis that federal courts use, That analysis derives from the Supreme Court's opinion in *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("AGC"), and has been synthesized into a five-factor inquiry in the Third Circuit. The Court assesses:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing;

> (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress;

> (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims;

> (4) the existence of more direct victims of the alleged antitrust violations; and

> (5) the potential for duplicative recovery or complex apportionment of damages.

*Eggs III* at 296 (describing the "AGC Test"). Private plaintiffs may also pursue injunctive relief under the federal antitrust laws. *Mid-West Paper Products Co. v. Continental Grp., Inc.*, 596 F.2d 573, 594 (3d Cir. 1979).

Defendants argue that the allegations underlying IP and EUP Plaintiffs' claims are insufficient to establish antitrust standing because they fail to satisfy the AGC Test. Plaintiffs respond that their claims do satisfy the AGC Test, and that in any event, several of their state law claims are not subject to the AGC Test. As discussed herein, the Court finds that Plaintiffs' claims satisfy *AGC*, and accordingly does not reach the question of which states apply the AGC Test and which apply some lower standard. *See In re Ductile Iron Pipe Fittings Indirect Purchaser Antitrust Litig.*, 2013 WL 5503308 (D.N.J. Oct, 2, 2013) (where unnecessary, the Court " 'decline[s] to undertake the back-breaking labor involved in deciphering the state of antitrust standing in each of those states.' ").

### i. First AGC Factor: Causal Connection and Intent

The first element of the AGC test weighs in Plaintiffs' favor because each set of Plaintiffs alleges that, despite not having purchased from Defendants directly, Defendants' intentional price-fixing scheme caused an increase in prices for Fragrance Products throughout the market and that they each resultantly purchased Fragrance Products at artificially inflated prices. These allegations are sufficient to withstand the motion to dismiss: according to the complaints, the Defendants controlled roughly two-thirds of the global fragrance market, controlled the boards of directors of highly influential trade associations, and were sufficiently vertically integrated to exercise significant influence over the production and processing of raw materials necessary for Fragrance production. And while Defendants argue that EUP Plaintiffs in particular cannot prove causation due to Fragrance Products being only one component of the product they purchased, "these facts are irrelevant to the resolution of defendants' motion to dismiss, which relies entirely upon what the complaint states." *D.R. Ward Const. Co. v. Rohm and Haas Co.*, 470 F. Supp. 2d 485, 502 (E.D. Pa. 2006). The same is true of Defendants' argument that other factors, "such as the supply chain, labor, transportation, the pandemic, and fluctuating demand—may affect the prices" that EUP Plaintiffs were charged. After discovery, Plaintiffs will bear the burden of demonstrating that it was Plaintiff's conduct that caused their injury, and Defendants will have the opportunity to advance their argument that these external factors were the true cause of any price increases. But for the purpose of this motion, the Court draws all reasonable inferences in the Plaintiffs' favor.

### ii. Second AGC Factor: Antitrust Injury

**\*15**  "The second factor, antitrust injury, 'is a necessary but insufficient condition of antitrust standing.' " *Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223, 233 (3d. Cir. 2013) (quoting *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 183 (3d Cir. 1997)). "As a general matter, the class of plaintiffs capable of satisfying the antitrust-injury requirement is limited to consumers and competitors in the restrained market, and to those whose injuries are the means by which the defendants seek to achieve their anticompetitive ends," *West Penn. Allegheny Health Sys.*, 627 F.3d at 102 (citations omitted).

### a. IP Plaintiffs

IP Plaintiffs allege that they purchased Fragrance Products "other than directly from Defendants." Defendants appear to conclude from this description that IP Plaintiffs purchased products that were actually produced by the Defendants, but purchased by IP Plaintiffs through downstream distribution channels. *See* Mot. at 49 (IP Plaintiffs "allege that they indirectly purchased non-specified fragrance compounds or ingredients *manufactured by defendants*" (emphasis added)). Making the same inference for the purpose of this motion,[6] the Court concludes that IP Plaintiffs have satisfied their antitrust injury pleading burden by alleging that they purchased Defendants' products (albeit indirectly) at supracompetitive prices. In other words, "the high price paid by consumers for [Fragrance Products] clearly resulted in the type of loss that the claimed violations ... would be likely to cause." *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 400 (3d Cir. 2000) (internal citation omitted); *see also In re Lamictal Indirect Purchaser and Antitrust Consumer Litig.*, 172 F. Supp. 3d 724, 741 (D.N.J. 2016) ("allegation that the settlement agreement between GSK and Teva led them to pay inflated prices for lamotrigine tablets is sufficient to meet [the antitrust injury] standard.")

### b. EUP Plaintiffs

Defendants' argument concerning EUP Plaintiffs is stronger —EUP Plaintiffs allege that they purchased end-user products "containing Fragrance Products manufactured or sold by at least one Defendant." EUP Plaintiffs do not enumerate which specific Fragrance-containing end-user products they have each purchased, Defendants refer the Court to *Magnesium*, 2011 WL 5008090, in which the court dismissed indirect purchasers' claims for lack of antitrust standing because the Defendants "fail[ed] to specify which ... products ... they purchased, The mere fact that a product contains [an ingredient] does not necessarily mean that an increase in the price of that product is 'inextricably intertwined' with ... the alleged conspiracy to fix prices in [the ingredient market]." *Id.* at *7. The court's analysis in that case focused on the potential differences between downstream products: "the price of [the ingredients] would have a minimal foreseeable effect on the price of products containing trace amounts of them, but a significant foreseeable effect on the price of products in which they are major ingredients." *Id.*

**\*16**  On this point, *Magnesium* (which is nonprecedential) departed from the reasoning of *D.R. Ward Const. Co. v. Rohm and Haas Co.* 470 F. Supp. 2d at 502. In that case, the federal district court in Pennsylvania considered a motion

to dismiss state antitrust claims for lack of antitrust injury in a case in which plaintiffs alleged "that they purchased and paid significantly more for products containing plastic additives as a result of defendants' price-fixing conspiracy." *Id.*[7] The court held that state antitrust claims brought in jurisdictions permitting recovery for indirect purchasers could not be dismissed for lack of antitrust injury where "[t]here is no indication that the [state statutes] were enacted to provide remedies to certain types of indirect purchasers, such as those who participate in the immediate market subject to the price-fixing conspiracy, but not to other categories of indirect purchasers which function at a lower level in the distribution chain, such as end consumers who purchase products containing an ingredient subject to the price-fixing conspiracy." *Id.* at 502-03. "In other words, if plaintiffs can show that the unlawful increase in the price of [Fragrance Ingredients] affected the cost of the products they purchased, regardless of whether plaintiffs participated in the immediate market for [Fragrance Ingredients] or the secondary market for [Finished Fragrance Products], the [state statutes permitting indirect purchaser plaintiffs] would appear to contemplate recovery." *Id.* at 503.

Here, the Court is inclined to follow *Rohm*: while the Complaint lacks sufficient detail to determine the *degree* of antitrust injury suffered by the EUP Plaintiffs, the fact that supracompetitively priced ingredients comprise any amount of the purchase price of end-user products purchased by the plaintiffs is sufficient to establish that *some* injury occurred. That suffices at this early stage.

### iii. Remaining AGC Factors: Directness, Existence of More Direct Victims, and Potential for Duplicative Recovery

"[I]ndirect purchaser status is [not] the death knell of plaintiff's claim. ... We are, instead, instructed by *AGC* to ascertain the nature of the relationship between the parties." *In re Lower Lake Erie Iron Ore*, 998 F.2d at1168. IP and EUP Plaintiffs seek only injunctive relief under the federal antitrust statutes. These Plaintiffs also seek "all forms of relief available" pursuant to each state antitrust statute. Under state laws that permit damages actions from indirect purchasers (*i.e.*, states with *Illinois Brick* repealers), this language contemplates damages in addition to injunctive relief. Under state laws that do not permit damages actions by indirect purchasers, the same language encompasses only injunctive relief (and the *AGC* analysis is therefore effectively the same as the federal law injunction-only analysis). Evaluation of the

remaining three *AGC* factors differs analytically depending on whether plaintiffs seek money damages or injunctive relief, but both analyses reach the same result.

### a. Claims for Damages Under *Illinois Brick* Repealer State Statutes

With respect to state statutory claims in states with *Illinois Brick* repealer laws in place, "antitrust standing is not unlimited," but the weight assigned to the directness factor "must either carry significantly less weight or directness must be analyzed more generously than under federal law. It would be inconsistent for a state to allow indirect purchasers to bring antitrust claims, only for the courts to cursorily dismiss those claims on antitrust standing grounds simply because they have been brought by indirect purchasers." *In re Suboxone Antitrust Litig.*, 64 F. Supp. 3d 665, 698 (E.D. Pa. 2014); *see also In re Intel Corp.*, 496 F. Supp. 2d 404, 410 (D. Del. 2007) ("[U]nder the state statutes asserted by Class Plaintiffs, indirect purchasers are permitted to bring claims, and therefore, the existence of more direct victims would not necessarily undercut Class Plaintiffs' standing."). Likewise, inclusion of indirect plaintiffs necessarily creates a risk of duplicative recovery, but "where states have explicitly rejected *Illinois Brick*, this Court is reluctant to undermine what the state legislatures have condoned." *In re Ductile Iron Pipe Fittings*, 2013 WL 5503308, at *18.

**\*17** Obviously, more direct victims than IP Plaintiffs and EUP Plaintiffs exist (and have brought suit here), so these factors weigh against antitrust standing. However, in light of the repealer status of the states at issue, the Court assigns these factors little weight in its *AGC* analysis.

### b. Claims for Injunctive Relief under Federal and State Law

"Some of the *AGC* inquiries—including the complexity of apportionment of damages, the risk of duplicative recovery, and the existence of more direct plaintiffs who may bring suit—are not implicated by suits seeking injunctive relief, particularly because 'one injunction is as effective as 100, and, concomitantly, that 100 injunctions are no more effective than one.' " *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 n.6 (1986) (quoting *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 261 (1972)); *see also McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 856 (3d Cir. 1996) (remanding to district court to allow for separate consideration of claim for injunctive relief because "[s]tanding analysis under section 16 is not identical to that for section 4"); *Sullivan v. DB*

*Investments, Inc.*, 667 F.3d 273 (3d Cir. 2011) (discussing same in context of class certification).

"While direct purchaser status is not mandated, the class must still make a showing of entitlement to injunctive relief requiring the demonstration of: (1) threatened loss or injury cognizable in equity; (2) proximately resulting from the alleged antitrust injury." *In re Warfarin Sodium*, 214 F.3d at 400. As already discussed, Plaintiffs have alleged an injury cognizable in equity (overcharges for purchases of products produced by, or containing products produced by, the Defendants). Plaintiffs have also alleged that these overcharges were the proximate result of Defendants' price-fixing conspiracy that resulted in supracompetitive prices for Fragrance Products. The AGC Test, as applied to claims for injunctive relief, is satisfied.

*4. State law claims*

Defendants next move to dismiss all of IP Plaintiffs' and EUP Plaintiffs' state law claims for a number of other reasons. The Court briefly addresses each in turn.

i. Failure of State Claims With Sherman Act Claims

Defendants argue that the "same flaws that defeat [IP Plaintiffs'] and [EUP Plaintiffs'] Sherman Act claims also defeat their state law claims—whether antitrust, consumer protection, or unjust enrichment—because they are 'tethered to the alleged illegal antitrust conduct.' " Mot. at 52 (citing *Baar v. Jaguar Land Rover N. Am., LLC*, 295 F. Supp. 3d 460, 464, 467 (D.N.J. 2018)). Because the Court has held that Plaintiffs' Sherman Act claims survive the motion to dismiss, this argument fails.

ii. IP Plaintiffs' Standing Under Certain State Laws

Defendants argue that IP Plaintiffs lack standing to pursue certain of their state law claims because they "assert claims under the antitrust, consumer protection, and common law of 30 states and D.C., even though named plaintiffs reside in only 11 of those states." Mot. at 53-54. This argument implicates a live issue within the Third Circuit: "[t]here is disagreement amongst district courts in this Circuit 'over whether plaintiffs in a class action may assert claims under the laws of states where the complaint does not allege connections between the named plaintiffs and those states.' " *Snowdy v. Mercedes-Benz USA, LLC*, 2024 WL 1366446 at *5 (D.N.J. Apr. 1, 2024).

**\*18** On one side of this debate are Plaintiffs, who argue that the Third Circuit's rulings in *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 361 (3d Cir. 2015) and *Mielo v. Steak 'N Shake Operations, Inc.*, 897 F.3d 467, 478 (3d Cir. 2018) stand for the proposition that "if a 'named plaintiff has standing [in one state], it can bring [other state] claims on behalf of a nationwide class.' " Opp. at 48 (quoting *Back2Health Chiropractic Center, LLC v. Sentinel Insurance Co., Ltd*, 2021 WL 960875 at *6-7 (D.N.J. Mar. 15, 2021)); *see also Rolland v. Spark Energy, LLC*, No. 17-2680, 2019 WL 1903990, at *5 n.6 (D.N.J. Apr. 29, 2019); *In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.*, No. 19-2875, 2022 WL 1013945 at *4 (D.N.J. Apr. 5, 2022).

On the other side are Defendants, who argue that plaintiffs "lack standing to assert claims in [states] where no named plaintiff is alleged to reside." Mot. at 54; *see also Snowdy*, 2024 WL 1366446, at *6; *Ponzio v. Mercedes-Benz USA, LLC*, 447 F. Supp. 3d 194, 223 (D.N.J. 2020); *Tijerina v. Volkswagen Grp. of Am., Inc.*, No. 21-18755, 2023 WL 6890996, at *8 (D.N.J. Oct. 19, 2023). Courts on this side of the debate have determined that "[t]here is a fairly even split of authority among the cases that have previously been confronted with this issue, and there is no binding Third Circuit precedent directly on point," implicitly determining that *Neale* and *Mielo* do not stand for the rule that Plaintiffs cite it for. *Snowdy*, 2024 WL 1366446, at *5 (D.N.J. Apr. 1, 2024).

The Court agrees with the Defendants that named plaintiffs must establish standing with respect to each claim they bring, even when they seek to represent a nationwide class which may ultimately include plaintiffs who themselves have standing. In *Neale*, the Third Circuit held that "putative class members need not establish Article III standing. Instead, the 'cases or controversies' requirement is satisfied *so long as a class representative has standing*, whether in the context of a settlement or litigation class." *Neale*, 794 F.3d at 362 (emphasis added). This means that, if named plaintiffs satisfy Article III standing requirements, putative class members will not subsequently be burdened with establishing standing. "Named plaintiffs are the individuals who seek to invoke the court's jurisdiction and they are held accountable for satisfying jurisdiction." *Id.* at 364 (citing *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 832 (1999)).

But the named plaintiffs themselves still must satisfy Article III standing requirements "for each claim [they] seek[ ] to press." *Long v. SEPTA*, 903 F.3d 312, 323 (3d Cir. 2018)

(quoting *Neale*, 794 F.3d at 359). Plaintiffs have failed to allege facts sufficient to establish standing to seek relief pursuant to the laws of states in which they do not reside and were not injured. In short, the obligation to establish standing rests with the named plaintiffs and applies to each and every claim they seek to pursue. *Accord Tijerina*, 2023 WL 6890996, at *8 ("Plaintiffs' nationwide claims are dismissed to the extent they are premised on state-law claims brought on behalf of putative class members outside of the eleven states represented by named Plaintiffs.").

Accordingly, the Court will **DISMISS** IP Plaintiffs' claims under the laws of Arizona, Arkansas, Colorado, Connecticut, Hawaii, Iowa, Kansas, Maine, Nebraska, New Hampshire, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and the District of Columbia for lack of Article III standing.

iii. Unjust Enrichment Pleading Sufficiency

**\*19**  Defendants seek to dismiss EUP Plaintiffs' unjust enrichment claims "for failure to specify the state law under which the plaintiffs proceed." Mot. at 54 (quoting *In re Ductile Iron Pipe Fittings*, 2013 WL 5503308, at *8. Plaintiffs respond that "EUPs are not required to plead separate unjust enrichment claims" at the pleading stage and that, alternatively, they adequately pleaded those claims through incorporation by reference. Opp. 59-60. As Defendants point out, Plaintiffs cite no precedent from any court in the Third Circuit in support of their argument, and the in-circuit authorities supporting Defendants' arguments are plentiful. *See, e.g., Avenarius v. Eaton Corp.*, 898 F. Supp. 2d 729, 740 (D. Del. 2012) ("Generic pleading and generic responsive briefing is inappropriate given that states analyze unjust enrichment claims differently"); *In re Flonase Antitrust Litig.*, 610 F. Supp. 2d 409, 419 (E.D. Pa. 2009); *In re Chocolate Confectionary Antitrust Litig.*, 602 F.Supp.2d 538, 587 (M.D. Pa. 2009); *In re Ductile Iron Pipe Fittings*, 2013 WL 5503308, at *8.

The Court will **DISMISS** EUP Plaintiffs' claim for unjust enrichment.

iv. *Illinois, Montana, and South Carolina Class Action Bars*

The Illinois Antitrust Act provides that "no person shall be authorized to maintain a class action in any court of this State for indirect purchasers asserting claims under this Act, with the sole exception of this State's Attorney General." 740 Ill.

Comp. Stat. 10/7(2). Pursuant to the Supreme Court's decision in *Shady Grove Orthopedic Association v. Allstate Insurance Co.*, this arguably procedural state rule nevertheless applies in the federal court setting if it is "part of a State's framework of substantive rights or remedies." (Stevens, J., concurring); *see also In re Generic Pharmaceuticals Pricing*, 368 F. Supp. at 834 (E.D. Pa. 2019). Though some courts have disagreed, "[t]he prevailing view of the District Courts that have considered this issue within this Circuit is that the Illinois Antitrust Act prohibits indirect purchaser class actions." *Id.*; *see also In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363 (D.N.J. 2018); *In re Lipitor Antitrust Litig.*, 336 F. Supp. 3d 395, 418 (D.N.J. 2018). *But see Mayor and City Council of Baltimore v. Merck Sharp & Dohme Corp.*, 2023 WL 8018980 (E.D. Pa, Nov. 20, 2023) (disagreeing with existing in-circuit authorities and allowing Illinois Antitrust Act claim to proceed).

This Court adopts the reasoning of the Eastern District of Pennsylvania in *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, follows the same course as each in-Circuit published opinion on this point, and will **DISMISS** Plaintiffs' Illinois Antitrust Act claims.

The same analysis applies to EUP Plaintiffs' and IP Plaintiffs' consumer protection claims under Montana law, and EUP Plaintiffs' consumer protection claim under South Carolina law. *See In re Lipitor Antitrust Litig.*, 336 F. Supp. 3d at 416-17 (dismissing Montana consumer protection claim pursuant to class action bar after *Shady Grove* analysis); *In re Generic Pharms, Pricing*, 368 F. Supp. at 844 (E.D. Pa. 2019) (dismissing Montana and South Carolina consumer protection claims pursuant to class action bar). The Court will **DISMISS** EUP Plaintiffs' and IP Plaintiffs' Montana and South Carolina consumer protection claims.

v. *Colorado Class Action Bar*

Colorado amended its antitrust law in 2023 to permit indirect-purchaser class actions. *See* Colo. Rev. Stat. Ann. § 6-4-115. The amendment "applies to conduct occurring on or after the effective date" of the Act, which took effect on June 7, 2023. Defendants argue that EUP Plaintiffs do "not allege when Colorado plaintiffs purchased any relevant products" and, as such, do not receive the benefit of the amendment, Plaintiffs counter that their consolidated complaints (filed February 5, 2024) allege conduct that "continues into the present." EC ¶ 159. The Court declines to dismiss the Colorado claim prior to discovery where the complaint alleges a continuing conspiracy into the present which could plausibly include

events occurring after the effective date of the Colorado amendment.

### vi. *Wisconsin, North Carolina, and Mississippi Antitrust Pleading Sufficiency*

**\*20** Defendants ask the Court to dismiss Plaintiffs' Wisconsin, North Carolina, and Mississippi claims for pleading deficiencies under each state's relevant statutes. "A civil plaintiff filing an action under Wisconsin's antitrust act must allege that (1) actionable conduct, such as the formation of a combination or conspiracy, occurred within this state, even if its effects are felt primarily outside Wisconsin; or (2) the conduct complained of 'substantially affects' the people of Wisconsin and has impacts in [Wisconsin], even if the illegal activity resulting in those impacts occurred predominately or exclusively outside of this state," *Olstad v. Microsoft Corp.*, 700 N.W. 2d 139, 158 (Wis. 2005). Plaintiffs have satisfied this burden. *See* EC ¶ 297; IC ¶ 290 (alleging that Defendants' conspiracy in restraint of trade resulted in substantial effects in Wisconsin including Plaintiffs paying supracompetitive prices for Fragrance Products and products containing Fragrance Products).

The North Carolina Unfair and Deceptive Trade Practices Act makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. State. Ann. § 75-1.1 *et seq.* Although some courts have dismissed NCUDTPA claims for failure to plead a substantial in-state effect, others —including in this Circuit—have held that "the NCUDTPA only requires plaintiffs to prove a substantial *injury* in North Carolina." *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 410 (E.D. Pa. 2010) (emphasis added); *but see In re Flonase Antitrust Litigation*, 692 F. Supp. 2d 524, 540 (E.D. Pa. 2010) (using "substantial in-state effect" language but still denying motion to dismiss). Plaintiffs allege that North Carolina EUP Plaintiffs and IP Plaintiffs have been injured by paying supracompetitive prices for Fragrance Products and goods containing Fragrance Products in North Carolina. Applying either formulation of the applicable test, the Court finds that, at the pleading stage, Plaintiffs have made the required showing under North Carolina law. *Accord In re Packaged Seafood Products Antitrust Litigation*, 242 F. Supp. 3d 1033, 1083 (S.D. Cal. 2017) (denying motion to dismiss NCUDTPA claims under substantial effects test); *In re Auto Parts Antitrust Litig.*, 2014 WL 2993753, at *16 (E.D. Mich. July 3, 2014) ("This Court is not persuaded that an incidental

versus a substantial in-state injury, which is a fact-based inquiry, can be assessed at this stage of the proceedings.").

Plaintiffs concede that their Mississippi antitrust claims are insufficient; the Court will **DISMISS** those claims.

### vii. *Application of AGC to Consumer Protection Claims*

Because Plaintiffs' claims satisfy *AGC* at the pleading stage, *see supra* II.A.1, Defendants' Nebraska and New York standing arguments fail.

### viii. *Consumer Protection Claims in States with Indirect Purchaser Antitrust Suit Prohibitions (Missouri, New Jersey, New York, and South Carolina)*

Defendants challenge Plaintiffs' consumer protection claims under Missouri, New Jersey, New York, and South Carolina law on the basis that these states bar antitrust suits by indirect purchasers and their consumer protection claims are based on the same conduct as their indirect purchaser claims.

Multiple federal courts that have had the opportunity to consider whether *Ireland v. Microsoft Corp.*, 2001 WL 1868946 (Mo. Cir. Ct. Jan. 24, 2001), should be interpreted to bar indirect purchaser claims under Missouri's consumer protection laws even after the Missouri Supreme Court ruled in *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007) which held that the MMPA "contemplates that other parties, besides the direct purchasers or contracting party, who suffer damages resulting from the violator's prohibited conduct under the Act are included in those eligible to receive restitution." On several occasions these courts have reasoned that "if faced with the issue today, the Missouri Supreme Court would allow indirect suits under the MMPA when a plaintiff has otherwise made out an MMPA claim." *In re Pool Products Distribution Market Antitrust Litig.*, 946 F. Supp. 2d 554, 570 (E.D. La. 2013); *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 4955377 (N.D. Cal. Oct. 2, 2014); *Picone v. Shire PLC*, 2017 WL 4873506 (D. Mass. Oct. 20, 2017); *In re Cattle Antitrust Litig.*, 2021 WL 7757881 (D. Minn. Sept. 14, 2021). This Court agrees, and further follows the Eastern District of Pennsylvania's comparable determination with respect to the consumer protection laws of New Jersey and South Caroline, *In re Generic Pharmaceuticals Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 840-41 (E.D. Pa. 2019). Defendants' argument for dismissal under New York's consumer protection statute fails because EUP Plaintiffs "have pleaded that overcharges occurred in New York," *In re Suboxone Antitrust Litigation*, 64 F. Supp. 3d 665, 702

(E.D. Pa. 2014), and because *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143 (E.D. Pa. 2009) is inapposite. *See In re Suboxone*, 64 F. Supp. at 702 (analyzing same issue).

### ix. *Whether IP Plaintiffs are Proper Plaintiffs Under Minnesota and New Mexico Law*

**\*21**  Minnesota's consumer protection statute may not apply to purchases made "for the purpose of reselling" the same merchandise that was purchased, but also "is not expressly limited to individual consumers and has not been interpreted that way by the courts." *Ly v. Nostrom*, 615 N.W.2d 302, 309-10 (Minn. 2000). "Courts examining [Minnesota's consumer protection statute] have indeed distinguished between 'merchants' and consumers, ... [h]owever, the Minnesota Supreme Court has not issued a blanket prohibition on merchants for all [such] claims." *Securian Financial Grp., Inc. v. Wells Fargo Bank, N.A.*, 2014 WL 6911100, at *6 (D. Minn. Dec. 8, 2014). "Instead, courts focus their analysis on whether a party can be considered a sophisticated merchant in the specific skill or goods at issue, and only those parties that are in fact deemed to be sophisticated merchants in the specific skills or goods at issue have been precluded from asserting Minnesota consumer claims." *Id.* [8]  The Court declines to make that determination at the motion to dismiss stage.

Defendants also argue that IP Plaintiffs' claims under the New Mexico's Unfair Trade Practices Act cannot be brought by IP Plaintiffs citing language from *Williams v. Foremost Insurance Company*, 102 F. Supp. 3d 1230, 1240 (D.N.M. 2015) that there is "no basis to expand [the Act] to give standing to a non-consumer third-party." The key fact in that case was that the would-be plaintiff "**did not purchase the [product] at issue** [ ], but insists that New Mexico law permits third parties to bring claims under the [Act]." *Id.* (emphasis added). Because the IP Plaintiffs here may constitute upstream consumers of Defendants' products, and the New Mexico statute does not bar businesses or corporations from recovery, Defendants' argument fails. *See Navajo Nation v. Urban Outfitters, Inc.*, 935 F.Supp.2d 1147, 1173 (D.N.M. 2013).

### x. *Sufficiency of Deceptive Conduct Pleading under Minnesota, New York, Pennsylvania, and Wisconsin consumer protection laws*

Defendants argue that IP Plaintiffs' and EUP Plaintiffs' claims under the consumer protection laws of Minnesota, New York, Pennsylvania, and Wisconsin require Plaintiffs

to plead deceptive conduct target on plaintiffs on which plaintiffs relied to their detriment. The Court finds that Plaintiffs plausibly alleged deception (including, for example, that Defendants misrepresented the true cause of price increases for the products they produced, *e.g.* EC ¶ 161; IC ¶ 137). *Accord In re Vascepa Antitrust Litigation Indirect Purchaser Plaintiffs*, 2023 WL 2182046 (D.N.J. Feb. 23, 2023) (allowing claims under Minnesota and New York claims to proceed where complaint alleged defendant "deceived the public, its investors, and consumers by both misrepresentation and/or by withholding material information.").

### xi. *Ability to Challenge Price-Fixing Conduct under Arkansas and Pennsylvania Consumer Protection Laws*

Defendants argue that Plaintiffs' price-fixing allegations are not sufficient to support a claim under the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-107(a)(10), relying on *In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1166-67 (N.D. Cal. 2015) in which the Court determined that the Act "does not extend to ... price inflation claims." *Lidoderm* expressly declined to follow multiple precedential decisions from cases in this Circuit on that point. *See id.* at 1166 (declining to follow *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F.Supp.2d 380, 405 (E.D. Pa. 2010) and *In re Chocolate Confectionary Antitrust Litig.*, 602 F.Supp.2d 538, 583 (M.D. Pa. 2009)). This Court will adopt the reasoning of the in-Circuit precedent and allow the ADTPA claim to proceed.

**\*22**  Similarly, the Court declines to dismiss Plaintiffs' Pennsylvania consumer protection claim at this stage. Defendants cite two cases in support of dismissal. The first, *In re K-Dur Antitrust Litig.*, 2008 WL 2660780, at *4 (D.N.J. Feb. 28, 2008), concerns a claim for unjust enrichment, not for consumer fraud. The second, *In re HIV Antitrust Litigation*, discusses a Pennsylvania state court case in which that court explained that antitrust trust conduct alleged under the Pennsylvania statute must "fit within one of the categories of behavior deemed, by administrative rule or in the Law itself, 'unfair methods of competition' or 'unfair or deceptive acts or practices,' " before dismissing one antitrust-related claim and allowing another to proceed "only because it involved 'allegedly disingenuous and misleading behavior.' " 2023 WL 3006572 (N.D. Cal. Apr. 18, 2023) (quoting *Anadarko Petroleum Corp. v. Commonwealth*, 206 A.3d 51, 60 (Pa. Commw. Ct. 2019), *aff'd in part, rev'd in part by* 247 A.3d 934 (Pa. 2021)). On that standard, Plaintiffs have stated a claim by alleging misrepresentation. *See* discussion *supra* at II.A.4.x.

xii. *Unconscionability Under New Mexico Unfair Practices Act*

Defendants argue that Plaintiffs failed to state a claim under the New Mexico Unfair Practices Act ("NMUPA"), N.M. Stat. § 57-12-3 on the theory that plaintiffs failed to allege a "gross disparity" in pricing sufficient to render the alleged price-fixing "unconscionable conduct" for the purpose of § 57-12-2(E). "Federal courts generally permit NMUPA actions in price-fixing cases provided that the plaintiff alleges a gross disparity between the price paid for a product and the value received,' " which may be satisfied by "averments that a conspiracy produced significant artificial increases in product price" the product at issue. *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 585-86 (M.D. Pa. 2009) (cleaned up). Plaintiffs' Complaints include allegations of "significant increases in prices over the Class Period," (IC ¶ 170; EC ¶ 195), and allegations that they were "forced to pay artificially inflated, supracompetitive prices" for Fragrance Products, (*see* IC ¶ 261; EC ¶ 271). This is sufficient to state a claim under the NMUPA.

xiii. *State-Specific Effects under Florida, Illinois, Massachusetts, and New York Consumer Protection Laws*

Defendants argue that four state law consumer protection claims fail because Plaintiffs failed to plead sufficient intrastate effects. "[P]leading intrastate conduct and allegations of nationwide price-fixing satisfies the nexus requirement for asserting claims under state antitrust and/ or consumer fraud statutes." *In re Liquid Aluminum Sulfate Antitrust Litig.*, No. CV 16-MD-2687 (JLL), 2017 WL 3131977, at *24 & n.26 (D.N.J. July 20, 2017) (collecting cases); *accord In re Suboxone Antitrust Litig.*, 64 F. Supp. 3d 665, 698-99 (E.D. Pa. 2014) (same under state laws of the District of Columbia, Kansas, North Carolina, North Dakota, South Dakota, Tennessee, and West Virginia). The Court finds that Plaintiffs' allegations of nationwide price fixing coupled with their allegations that they alleged substantial effects arising from purchases of Fragrance Products within the states under whose laws they sue is sufficient to state a claim under the Florida, Illinois, Massachusetts, and New York consumer protection statutes.

xiv. *Nevada Deceptive Trade Practices Act Elderly/ Disability Requirement*

Nevada's Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903 *et seq.*, defines deceptive trade practices and

provides for enhanced relief for some classes of individuals, including elderly, disabled, or minor persons, but does not bar recovery by other persons. "An action may be brought by any person who is a victim of consumer fraud," which includes "[a] deceptive trade practice as defined in [Nev. Rev. Stat. §§] 598.0915 to 598.0925, inclusive." Nev. Rev. Stat. § 41.600. Defendants' argument for dismissal fails.

**B. Leave to Amend**

**\*23** Plaintiffs request leave to amend to the extent their Complaint is deficient. Opp. at 63. "A decision on whether to permit amendment of the pleadings generally falls within the District Court's discretion," but that discretion "must be 'exercised within the context of [Rule 15's] liberal pleading rules.' " *Mullin v. Balicki*, 875 F.3d 140, 150 (3d Cir. 2017). "In determining whether leave to amend might reasonably be denied, courts are guided by the *Foman* factors, named for the Supreme Court's decision in *Foman v. Davis*, 371 U.S. 178 (1962)." *Id.* at 149. Under *Foman*, "[d]enial of leave to amend can be based on undue delay, bad faith or dilatory motive on the part of the movant; repeated failure to cure deficiencies by amendments previously allowed; prejudice to the opposing party; and futility." *Id.*

Consistent with Rule 15's liberal pleading rules, the Court will grant IP Plaintiffs and EUP Plaintiffs leave to amend their complaints to address the deficiencies discussed herein. In light of the already-complex procedural history of this matter, and to avoid potential undue prejudice to Defendants as a result of further unnecessary delays, Plaintiffs are advised that the Court will not be inclined to grant any subsequent requests for amendment unless for good cause shown or as required by law. *See Mullin*, 875 F.3d at 150 ("Relying on the *Foman* factors, courts can choose [ ] to impose reasonable conditions on the right to amend in lieu of a pure grant or denial.").

**III. CONCLUSION**

For the foregoing reasons, Defendants' omnibus motion to dismiss Plaintiffs' Complaints under Rule 12(b)(6) of the Federal Rules of Civil Procedure is **GRANTED IN PART** and **DENIED IN PART**. An appropriate Order follows.

**DATE:** February 21, 2024

**All Citations**

Slip Copy, 2025 WL 595107

## Footnotes

1    For ease of reference, the Court adopts the following shorthands for citation to the three consolidated dockets: The direct purchaser docket, 2:23-cv-2174, is referred to as "D. Dkt." The direct purchaser complaint is referred to as "DC." The indirect purchaser docket, 2:23-cv-3249, is referred to as "I. Dkt." The indirect purchaser complaint is referred to as the "IC." The end-user plaintiff docket, 2:23-16127, is referred to as "E. Dkt." The end-user complaint is referred to as the "EC."

2    On July 2, 2024, plaintiffs filed a motion requesting that the Court take judicial notice of newly publicized documents related to the Government Investigations when considering the defendants' motions to dismiss. "While the rules allow a court to take judicial notice at any stage of the proceedings, Fed R. Evid. 201(f), [the Third Circuit] believe[s] that it should be done sparingly at the pleadings stage." *Victaulic Co. v. Tieman,* 499 F.3d 227, 236 (3d Cir. 2007). Here, consideration of the materials that form the basis of the request for judicial notice would not alter the Court's opinion; accordingly, the motion for judicial notice will be **DENIED**. *See Al-Hasani v. Sec'y United States Dep't of Homeland Sec.,* 81 F.4th 291, 301 (3d Cir. 2023).

3    Gary R. Spratling, Deputy Assistant Attorney General, Antitrust Division, U.S. Department of Justice, ABA's Criminal Justice Section Presentation "Are the Recent Titanic Fines in Antitrust Case Just the Tip of the Iceberg?" (Mar. 6, 1998).

4    The plaintiffs allege that while Fragrance Products are interchangeable *with each other*, they cannot easily be substituted for a different product altogether—*i.e.*, a customer could not gain the desired effect of a Fragrance Product buy purchasing a different item.

5    The earliest-filed Direct Purchaser complaint was filed on April 18, 2023; the earliest-filed Indirect Purchaser complaint was filed on June 13, 2023; and the earliest-filed End-User complaint was filed on September 5, 2023. Accordingly, Defendants argue that the statute of limitations bars recovery by each group of plaintiffs for actions occurring prior to April 18, 2019; June 13, 2019; and September 5, 2019, respectively.

6    The phrasing of IP Plaintiffs' complaint leaves open the possibility that IP Plaintiffs purchased Fragrance Products from other industry actors not involved in the alleged conspiracy. To the extent that the Fragrance Products purchased by IP Plaintiffs were produced by Defendants' competitors, and not by Defendants, IP Plaintiffs would appear to be left only with an "umbrella theory" of antitrust liability. *See Mid-West Paper Products Co. v. Continental Group, Inc.,* 596 F.2d 573 (3d Cir. 1979) ("[I]t cannot readily be said with any degree of economic certitude to what extent, if indeed at all, purchasers from a competitor of the price-fixers have been injured by the illegal overcharge."). The Court presumes that this factual question will be resolved through discovery and raised, if necessary, in due course.

7    Like the plaintiffs in *Magnesium*—and, indeed, like the plaintiffs here—the *Rohm* plaintiffs did not allege which specific plastics-additives-containing end-user products they purchased, instead each alleging that they "indirectly purchased Defendants' Plastic Additives." *See* No 2:05-cv-014157-LDD, ECF No. 24, ¶¶ 3-5.

8    While the Northern District of Illinois described the standard somewhat differently in its decision in *In re Broiler Chicken Antitrust Litig.,* 2023 WL 5227130, at *3 (N.D. Ill. Aug. 15, 2023), that case still arose on summary judgment, not a motion to dismiss, and relied in part on the fact that "Plaintiffs allege, *and the evidence shows*, that the Indirect Purchaser Plaintiffs purchased [products] for business reasons." (Emphasis added).

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.